# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-KA-01229-COA

**AMBER TURNAGE**                                                           **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                                    **APPELLEE**

DATE OF JUDGMENT:            04/13/2021
TRIAL JUDGE:                 HON. ADRIENNE HOOPER-WOOTEN
COURT FROM WHICH APPEALED:   HINDS COUNTY CIRCUIT COURT,
                             FIRST JUDICIAL DISTRICT
ATTORNEY FOR APPELLANT:      OFFICE OF STATE PUBLIC DEFENDER
                             BY: ZAKIA HELEN ANNYCE BUTLER
ATTORNEY FOR APPELLEE:       OFFICE OF THE ATTORNEY GENERAL
                             BY: ALEXANDRA LEBRON
DISTRICT ATTORNEY:           JODY EDWARD OWENS II
NATURE OF THE CASE:          CRIMINAL - FELONY
DISPOSITION:                 AFFIRMED - 11/29/2022
MOTION FOR REHEARING FILED:

### BEFORE BARNES, C.J., McDONALD AND LAWRENCE, JJ.

### McDONALD, J., FOR THE COURT:

¶1.    Amber Turnage appeals her jury conviction of two counts of sexual battery in violation of Mississippi Code Annotated section 97-3-95(2) (Rev. 2014) (criminalizing sexual battery of a child under eighteen when defendant is in position of trust).[1]  For each

---

[1] Section 97-3-95(2) provides:

> A person is guilty of sexual battery if he or she engages in sexual penetration with a child under the age of eighteen (18) years if the person is in a position of trust or authority over the child including without limitation the child's teacher, counselor, physician, psychiatrist, psychologist, minister, priest, physical therapist, chiropractor, legal guardian, parent, stepparent, aunt, uncle, scout leader or coach.

conviction, the Hinds County Circuit Court sentenced Turnage to a term of fifteen years in the custody of the Mississippi Department of Corrections (MDOC), with five years suspended and ten years to serve, and five years of supervised probation on each count. The court ordered that both sentences run concurrently. On appeal, Turnage's counsel filed a *Lindsey* brief stating that there were no arguable issues for appeal.[2] Although Turnage was given the opportunity, she did not file a supplemental pro se brief or identify any issues on appeal. After a thorough review of the record, we affirm Turnage's convictions and sentences.

## Facts

¶2. On May 10, 2017, Turnage, a high school science teacher, was indicted on six counts of sexual battery of K.W., a seventeen-year-old student, while Turnage was in a position of trust.[3] The indictment covered a period from November 1, 2016, to April 27, 2017, and alleged that Turnage performed fellatio on K.W. at various times and in various places, including Turnage's truck, at K.W.'s cousin's residence, and in a hotel room.

¶3. The trial was continued several times between 2017 and 2021. On March 11, 2021, the trial began, and the State presented several witnesses, including the investigating police officer Jerrick Taylor, Turnage's former principal Leketia Marshall-Thomas, K.W., K.W.'s father, and K.W.'s cousin Rodney Lewis. The State also entered into evidence two videos

---

[2] *Lindsey v. State*, 939 So. 2d 743 (Miss. 2005), sets forth the procedure appellate counsel is to follow when he or she finds no arguable issues to raise on appeal.

[3] To protect the minor's privacy, the minor is identified only by his initials.

that K.W. had taken: one of Turnage performing oral sex on him in her truck and another of them kissing at Walmart.

¶4. K.W. testified that Turnage was his sister's tutor and that he had never spoken to Turnage until the day he got kicked off the basketball team. Turnage met him coming out of the gym and offered to take him home. This was the first time she performed oral sex on him, which K.W. videoed with his phone. Their relationship grew, and K.W. called Turnage his girlfriend, said that he loved her, and maintained they had an ongoing sexual relationship that lasted for several months until their families found out. K.W. said that he never forced Turnage to have sex and that she voluntarily gave him gifts, credit cards, and money. K.W. testified about the details of their sexual encounters, which ranged from oral sex in Turnage's truck to having intercourse at hourly motels after school. K.W. also said that he and Turnage had had sex over one hundred times until almost the end of the school year. Then Turnage's husband caught them together at an AT&T store and confronted K.W. about having an affair with Turnage. The security guard took them outside, and the argument continued until the husband pulled a gun and threatened to kill K.W.

¶5. K.W.'s cousin Rodney Lewis verified K.W.'s testimony of the romantic relationship between Turnage and K.W. Lewis stated that they would regularly come to his one-bedroom home that he shared with his brother. K.W. and Turnage would have sex in the bedroom while Lewis sat in the living room with his brother. Lewis saw them kissing, heard them in the bedroom, and discarded used condoms after they left.

¶6.     K.W.'s father testified that he had no knowledge of any inappropriate relationship between his son and Turnage until he found the sex video of K.W. and Turnage on K.W.'s phone.  He checked K.W.'s phone because Turnage started coming by his house on weekends, as well as week nights, and he thought something might be going on between them.  After seeing the video, K.W.'s father immediately reported the matter to the school district and the police.  Thereafter, K.W.'s father said Turnage called him and asked him to lie and say that the person in the sexually explicit video was him and not K.W.

¶7.     During the testimony of the lead detective on the case, Jerrick Taylor, the State entered the videos K.W. had made of him and Turnage.  Through Taylor, the State also entered a Belks reward card, a School Aid gift card, and a Steinmart card that K.W. had testified Turnage had given him.

¶8.     Turnage's former school principal Leketia testified that she began an investigation into the relationship between Turnage and K.W. after receiving a phone call from the AT&T store.  It was reported to her that the husband of a teacher, who was later identified as Turnage, had an altercation with K.W.  Leketia learned of the video that K.W. had made and suspended Turnage.  Turnage's employment was ultimately terminated.

¶9.     The defense called only one witness, Turnage.  She testified that she was a high school biology teacher with fifteen years of experience.  At the time in question, she was teaching at K.W.'s school and also acted as an academic liaison who assisted student athletes with understanding and meeting the requirements for college admission.  She said the basketball

coach asked her if she would help K.W., a player on the team. She endeavored to help K.W. succeed in attending class, increasing his GPA so he could continue to play and have what he needed to compete his classroom learning. However, Turnage said K.W. started taking advantage of her kindness and became aggressive toward her, trying to "hit on her." She reported this activity to his coach and to K.W.'s father, asking both to help stop this behavior.[4] When K.W. was released from the basketball team for behavioral issues, Turnage claimed that she no longer felt an obligation to continue helping him, but she would see K.W. at his house because she was tutoring his sister in biology. Turnage testified that K.W. became obsessed with her, coming to her classroom uninvited and constantly texting her.

¶10. Turnage testified that one day K.W. called her and said he needed a prescription filled, but his parents did not have the money. Turnage got the prescription and delivered it to K.W. at Lewis's house. She said that upon arriving, K.W. had a gun, took her keys and phone, and said she was not going anywhere until she did what he wanted. She escaped to her truck and felt that the only way she could leave was to do what K.W. forced her to do—perform oral sex on him and have intercourse with him. Turnage contended that this was the only sexual incident between them. Turnage also asserted that K.W. recorded the incident and blackmailed her with it. He demanded money and stole from her. Her explanation for the video of her kissing K.W. at the Walmart was that she "felt trapped" and "demeaned" and

---

[4] Turnage did not call the coach as a witness to corroborate her testimony that she reported K.W.'s behavior to him. In addition, K.W.'s father testified that he first learned of the relationship only when he found the video on K.W.'s phone.

was just trying to survive. She denied having sex with K.W. after that incident in the truck. Although Turnage said she told her sister and another teacher about what was going on, she did not call any witness to corroborate her testimony.

¶11. At the conclusion of the trial, the jury was instructed and found Turnage guilty of two of six counts of sexual battery, and not guilty of the other four counts. On April 8, 2021, the circuit court sentenced Turnage to two concurrent terms of fifteen years in the custody of MDOC, each with five years suspended and ten years to serve, and five years of supervised probation on each count.

¶12. On April 23, 2021, Turnage filed a motion for judgment notwithstanding the verdict (JNOV) or a new trial. Although she raised several non-specific errors, such as the court's overruling her objections without specifying what objections she was referring to, she did argue that the court erroneously allowed the State to impeach her during cross-examination as to her post-*Miranda* silence.[5] This was the only issue that Turnage argued at the court's hearing of her post-trial motion on September 17, 2021. Turnage asserted that the State improperly asked her whether she had ever reported K.W.'s conduct to the police even after she was arrested. Turnage argued that this questioning violated her constitutional right to remain silent. However, the State argued that the United States Supreme Court in the case of *Fletcher v. Weir*, 455 U.S. 603, 607 (1982), held that for purposes of cross-examination regarding post-arrest silence when a defendant chooses to testify at trial, the right to remain

___

[5] *Miranda v. Arizona*, 384 U.S. 436 (1966).

silent embodied in *Miranda* arises only if a defendant is questioned by law enforcement and if the defendant is given his *Miranda* warnings.[6] In this case, Turnage was never questioned by the police. Instead, Turnage *picked up* her indictment on May 18, 2017, at 9:22 a.m. and was released from detention on bond at 9:45 a.m. that same day. She was not questioned that day, and when police reached out to her later to have her give a statement, she never went to give one. Thus, because Turnage was never questioned by law enforcement, the State was permitted to ask her at trial why she never reported K.W.'s threatening conduct to the police. The circuit court agreed and denied Turnage's motion for JNOV or a new trial. The court's order was entered on September 27, 2021, and on October 27, 2021, Turnage filed her notice of appeal from the judgment of conviction and sentence.

## Discussion

¶13. The State Public Defender's Indigent Appeals Division was appointed to represent Turnage on appeal and filed a "*Lindsey* brief" contending that there are no arguable issues in the record for appeal. *Lindsey* requires the following:

(1) Counsel must file and serve a brief in compliance with Mississippi Rule of Appellate Procedure 28(a)(1)-[(5), (8)];

(2) As a part of the brief filed in compliance with Rule 28, counsel must certify that there are no arguable issues supporting the client's appeal, and he or she has reached this conclusion after scouring the record thoroughly, specifically examining: (a) the reason for the arrest and the circumstances surrounding arrest; (b) any possible violations of the client's right to counsel; (c) the entire

---

[6] We note that this Court applied the same rationale in *Henderson v. State*, 12 So. 3d 543, 546 (¶13) (Miss. Ct. App. 2009).

trial transcript; (d) all rulings of the trial court; (e) possible prosecutorial misconduct; (f) all jury instructions; (g) all exhibits, whether admitted into evidence or not; and (h) possible misapplication of the law in sentencing.

(3) Counsel must then send a copy of the appellate brief to the defendant, inform the client that counsel could find no arguable issues in the record, and advise the client of his or her right to file a pro se brief.

(4) Should the defendant then raise any arguable issue or should the appellate court discover any arguable issue in its review of the record, the court must, if circumstances warrant, require appellate counsel to submit supplemental briefing on the issue, regardless of the probability of the defendant's success on appeal.

(5) Once briefing is complete, the appellate court must consider the case on its merits and render a decision.

*Lindsey*, 939 So. 2d at 748 (¶18) (citations, footnotes, and internal quotation marks omitted).

¶14. In this case, Turnage's appellate counsel filed a brief in compliance with the Mississippi Rules of Appellate Procedure. Counsel certifies that she has thoroughly reviewed the parts of the record that *Lindsey* requires, and she has found no appealable issues. Counsel also certifies that she mailed a copy of the brief to Turnage. Thereafter, this Court issued an order on May 12, 2022, providing Turnage with an additional forty days to file a pro se supplemental brief. Turnage did not file any pro se brief.

¶15. This Court has undertaken an independent and thorough review of the record and finds that there are no issues that warrant reversal. Thus, we affirm Turnage's convictions and sentences.

¶16. **AFFIRMED.**

> **BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE,**

8

**WESTBROOKS, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR.**